UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHELLE M. WILCOX,

              Plaintiff,

   -v-

COMMISSIONER OF SOCIAL SECURITY,[1]

              Defendant.
_____

16-CV-726-MJR

DECISION AND ORDER

Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 14).

Plaintiff Michelle M. Wilcox ("Wilcox" or "plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, plaintiff's motion (Dkt. No. 11) is denied and the Commissioner's motion (Dkt. No. 12) is granted.

## BACKGROUND

On June 5, 2012, plaintiff protectively filed an application for DIB and subsequently filed an application for SSI on June 22, 2012. (*See* Tr. 108-20, 144).[2] In both applications, plaintiff indicated that she has been disabled since May 22, 2012 as a result of fibromyalgia, Raynaud's syndrome, depression, anxiety and chronic obstructive

---

[1]     The Clerk of Court is directed to amend the caption accordingly.
[2]     References to "Tr." are to the administrative record in this case.

pulmonary disease (COPD). (Tr. 135). Born on April 16, 1966, plaintiff was 46 years old at the time of the alleged disability onset date. (Tr. 429). Her benefit applications were initially denied on October 9, 2012. (Tr. 56). Plaintiff sought review of the determination, and a hearing was held before Administrative Law Judge ("ALJ") William E. Straub on April 25, 2013. (Tr. 28-45). On May 6, 2013, ALJ Straub issued a decision that plaintiff was not disabled under the Act. (Tr. 12-24). Plaintiff sought review of the decision, and the Appeals Council denied her request for review. (Tr. 1-4). Plaintiff then filed a civil action in this Court. (*See Wilcox v. Colvin*, 13-CV-994; Tr. 471-86). On November 13, 2014, this Court remanded the case for further administrative proceedings. (Tr. 471-86). Specifically, the Court instructed the ALJ to: (1) weigh treating counselor Doreen Nuessle's opinion regarding plaintiff's depression using the factors set forth in Social Security Ruling ("SSR") 06-03p; (2) reevaluate the medical record as to plaintiff's fibromyalgia; and (4) reevaluate the opinions of Dr. Richard Bennett and his psychiatric nurse practitioner Melissa A. Merlin as well as other medical evidence regarding plaintiff's depression. (*Id.*). On February 3, 2015, the Appeals Council issued a Remand Order which vacated ALJ Straub's May 6, 2013 decision and remanded the case for "further proceedings consistent with the order of the court."[3] (Tr. 489).

ALJ Robert Harvey conducted the second hearing as to plaintiff's claims on June 3, 2015. (Tr. 443-70). During the hearing, he took testimony from plaintiff and from vocational expert (VE) David Sypher. (*Id.*). On July 16, 2015, ALJ Harvey issued a decision finding that plaintiff was not disabled under the Act. (Tr. 418-36). Plaintiff's

---

[3] At that time, the Appeals Council consolidated the remanded claim with plaintiff's subsequently filed SSD and SSI (both filed on September 27, 2013) claims to a create a single electronic record and allow for a hearing and determination based upon the consolidated claims. (Tr. 489)

request for review of the decision was denied by the Appeals Council on July 9, 2016. (Tr. 408-14). ALJ Harvey's 's July 16, 2015 denial of benefits became the Commissioner's final determination, and the instant lawsuit followed. (Dkt. No. 1).

## DISCUSSION

I.  *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (WDNY 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (WDNY 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine

3

conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

  II. *Standards for Determining "Disability" Under the Act*

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations."

5

*Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work or does not have any past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act. *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

III. <u>*The ALJ's Decision*</u>

The ALJ first found that plaintiff met the insured status requirements of the Act through September 30, 2016. (Tr. 420). The ALJ then followed the required five-step analysis for evaluating plaintiff's claim. Under step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of May 22, 2012.[4]

---

[4] The ALJ noted that plaintiff testified that she worked at Fiddler's Green Manor Nursing Home as an activities aide. (*Id.* at 420) However, her earnings from this position, $6,669.57 in 2013 and $3,820.00 in 2014, did not rise to the level of substantial gainful activity. (*Id.*).

(*Id.*). At step two, the ALJ found that plaintiff has severe impairments consisting of fibromyalgia, depressive disorder and anxiety disorder.[5] (*Id.*). At step three, the ALJ determined that plaintiff does not have an impairment that meets or medically equals the severity of one of the listed impairments. (Tr. 421-22). Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[6] except she has occasional limitations in the ability to reach in all directions, handle, finger, and feel. The claimant has occasional limitations in the ability to understand, remember, and carry out instructions as well as in the ability to interact appropriately with the general public. She also has occasional limitations in the ability to respond appropriately to changes in the work setting, deal with stress, and make decisions. The claimant retains the ability to perform the basic mental demands of unskilled work including the ability to understand, remember, and carry out simple instructions; respond appropriately to supervision, co-workers, and usual work situations and deal with changes in a routine work setting.

(Tr. 422-29). Proceeding to step four, the ALJ determined that plaintiff is unable to perform her past relevant work as assistant manager of a retail store. (Tr. 429, 455-56). During the hearing, the ALJ noted that this position constituted medium work and required the ability to lift an average of 30 to 40 pounds. (*Id.*). In considering step five, the ALJ heard testimony from VE Sypher. (Tr. 430). Based upon Sypher's testimony, which took into account plaintiff's age, education, work experience and RFC, the ALJ concluded that

---

[5] The ALJ noted that the record indicates a diagnosis of chronic obstructive pulmonary disease ("COPD"). (Tr. 421) However, plaintiff is not being treated for COPD and takes no medication for this condition. (*Id.*). Plaintiff testified to having knee surgery in 2009 or 2010 but stated that this condition was resolved. (*Id.*). In addition, there are allegations in the record as to plaintiff having Raynaud's syndrome but no evidence that this is a severe impairment. (*Id.*).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range or light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§404.1567(b) and 416.967(b).

7

plaintiff can perform jobs that exist in significant numbers in the national economy. (Tr. 429-30). Accordingly, the ALJ found that plaintiff has not been under a disability within the meaning of the Act from May 22, 2012 through the date of his decision.

IV. *Wilcox's Challenges*

Wilcox first argues that the ALJ failed to properly evaluate the opinion of Doreen Nuessle, LCSW-R. (Dkt. No. 11-1).

SSR 06-03p instructs that when evaluating relevant evidence in the record, an ALJ must consider evidence from both "acceptable medical sources", such as physicians, and also "medical sources who are not acceptable medical sources", such as nurse practitioners and licensed clinical social workers. SSR 06-03p, 2006 SSR LEXIS 5, *4-5. SSR 06-03p directs the ALJ to employ the same factors in evaluating opinions from other sources as are used to evaluate the opinions of acceptable medical sources. *Id.* at *11-12. These factors include: the frequency of treatment, consistency with other evidence in the record, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise. *Id.* Not every factor will apply in every case. *Id.* Evidence from other sources cannot be used to establish the existence of a medically determinable impairment, but it may provide insight into the severity and effects of impairments on an individual. *Id.* at *4-5. Importantly, opinions from other sources do not demand the same deference as those of a treating physician. *Geiner v. Astrue*, 298 Fed. Appx. 105, 108 (2d Cir. 2008); *Wichelns v. Comm'r of Soc. Sec.*, 5:12-CV-1595, 2013 U.S. Dist. LEXIS 186607, *18 (NDNY Dec. 20, 2013) ("Social workers are considered an 'other source' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.")

8

When an ALJ assigns little or no weight to other source opinions, such as those provided by a social worker, those decisions should be explained. *See Colon v. Astrue*, 11-CV-00210, 2013 U.S. Dist. LEXIS 72311, *26 (WDNY May 21, 2013). However, "[c]ourts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical formulaic applications of governing legal principle." *Abdulsalam v. Comm'r of Soc. Sec.*, 12-CV-1631, 2014 U.S. Dist. LEXIS 13442 (NDNY Feb. 4, 2014) (internal citations omitted). *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (Where an ALJ's reasoning and adherence to the regulations are clear, a "slavish recitation of each and every factor" was not required.). Indeed, SSR 06-03p instructs that the ALJ need only "ensure[] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 2006 SSR LEXIS 5, at *15.

Nuessle, a licensed clinical social worker at Suburban Psychiatric Associates, counseled Wilcox once a week from March 18, 2012 through July 6, 2012. (Tr. 324, 425). In a form submitted to the New York State Office of Temporary and Disability Assistance, Nuessle stated that she provided Wilcox "individual trauma based therapy to identify and adhere to healthy boundaries within relationships [and cognitive behavior therapy] to assist with developing structure to minimize the impact of negative, automatic thoughts and flashbacks from traumatic experiences." (Tr. 327). Nuessle opined that Wilcox had difficulty remembering tasks, became overwhelmed easily, and was highly sensitive to criticism from authority and peers. (Tr. 328). She found that Wilcox had a moderate impairment in her ability to do work-related activities but no limitation in understanding or memory. (Tr. 328-29). Nuessle further noted that Wilcox had difficulty following detailed

9

directions, poor stress management skills, was reactive to changes, had difficulty with transitions and was limited as to social interaction. (Tr. 329). However, the ALJ gave little weight to Nuessle's opinion because it was not fully supported by the findings of Dr. Susan Santarpia, a psychiatrist who conducted a consultative psychiatric evaluation of Wilcox. (Tr. 365-69, 425). While Dr. Santarpia's findings were not entirely inconsistent with those of Nussle, she found Wilcox to have less impairments or restrictions with respect to her mental functioning. For example, Dr. Santarpia opined that Wilcox had mild impairments in learning new tasks and appropriately dealing with stress and moderate impairments in performing complex tasks independently, making appropriate decisions, and relating adequately with others. (Tr. 368, 426). Dr. Santarpia also found that Wilcox was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration and maintain a regular schedule within normal limits. (Tr. 368, 426).

The Court finds that the ALJ adequately considered Nuessle's opinion in accordance with SSR 06-03p and the case law discussed above. Further, the ALJ sufficiently explained why little weight was given to Nuessle's conclusions. The ALJ noted that Nuessle was a social worker and also explained the specific type of counseling she provided to Wilcox. The ALJ cited records which set forth the length and frequency of Nuessle's treatment sessions. The ALJ also provided a detailed explanation of Nuessle's findings. After considering these factors, the ALJ elected to give little weight to Nuessle's opinion because it was not fully supported by the findings of Dr. Santarpia. (Tr. 425). The ALJ also thoroughly explained Dr. Santarpia's findings. (Tr. 426). In electing to give Dr. Santarpia's findings significant weight, the ALJ noted that her opinion was based on a

thorough evaluation of Wilcox and that her conclusions were consistent with her findings on the mental status examination. (*Id.*). *See* SSR 06-03P, 2006 SSR LEXIS 5, *9 (internal quotations omitted) ("The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source which is not an acceptable medical source because…acceptable medical sources are the most qualified health care professionals.").

Indeed, the record demonstrates that the ALJ did not reject Nussle's findings because they were from a non-medically acceptable source but instead because they were not supported by the findings of the consultative examiner. The standard for assessing an opinion of a licensed clinical social worker is not as stringent as the standard for the assessing the opinion of a treating physician. Here, the ALJ was not required to provide good reasons for assigning little weight to Nuessle's opinion but instead was obligated only to consider the opinion pursuant to appropriate factors and explain why it was rejected. The ALJ's discussion satisfies this requirement. *See Monette v. Colvin*, 654 Fed. Appx. 516 (2d Cir. 2016) (rejecting plaintiff's argument that the ALJ committed legal error by attributing more weight to the opinion of a consulting psychologist than to the opinion of a treating nurse practitioner since the nurse practitioner was not an acceptable medial source whose opinion was eligible for controlling weight, and the "nurse practitioner's opinion was nevertheless considered, not overlooked"); *Atkinson v. Comm'r of Soc. Sec.*, 5:16-cv-0809, 2017 U.S. Dist. LEXIS 52831 (NDNY April 6, 2017) (Where the ALJ "specifically indicated that she found each of the two opinions were not consistent with or supported by treatment evidence in the record, discussed pertinent treatment evidence in her narrative, acknowledged the relationship between these

11

sources and [p]laintiff, and acknowledged their credentials and the areas and types of treatment each provided", the discussion satisfied the requirements for weighing opinion evidence from other sources); *c.f. Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335 (EDNY 2010) (remand was appropriate where the ALJ disregarded an opinion simply because it was the opinion of a social worker, not on account of its content or whether it conformed with the other evidence in the record).

Furthermore, the ALJ's RFC assessment is not entirely inconsistent with Nuessle's findings. Nuessle found that Wilcox had difficulty following detailed instructions but had no limitations as to understanding and memory. (Tr. 329). Similarly, the RFC indicates that plaintiff has occasional limitations in the ability to understand, remember, and carry out instructions but retained the ability to perform the basic demands of unskilled work including the ability to understand, remember and carry out simple instructions. (Tr. 422). Nuessle opined that Wilcox had moderate impairments in her ability to work which included limitations in stress management, social interaction, reacting to changes and responding to criticism. (Tr. 328-29). The RFC reflects that Wilcox has occasional limitations in her ability to interact with the general public, respond appropriately to changes in the work setting and deal with stress. (Tr. 422). Therefore, while Nuessle may have found Wilcox to be somewhat more limited in aspects of her mental functioning than found by the consultative psychiatrist or the ALJ, many of the limitations found by Nuessle were incorporated in the RFC. Thus, the Court rejects Wilcox's argument that had the ALJ credited Nuessle's opinion, it would necessarily have resulted in a finding that Wilcox was disabled under the Act.

Wilcox also argues that the ALJ failed to properly evaluate the opinion of treating psychiatrist Dr. Richard G. Bennett. (Dkt. No. 11-1).

Wilcox treated with psychiatric nurse practitioner Melissa A. Merlin on four occasions at Suburban Psychiatric Associates between June 11, 2012 and October 2, 2012. (Tr. 317-19, 320-21, 322-23, 380-81). Records from those sessions indicate that Merlin treated Wilcox for depression and anxiety and provided medication assessment and management. (*Id.*). On December 11, 2012, a Mental Impairment Questionnaire was completed on behalf of Wilcox. (Tr. 401-404). Both Merlin and Dr. Richard G. Bennett, a psychiatrist at Suburban Psychiatric Associates, signed the Questionnaire. (*Id.*).

The Court first notes that there is no evidence in the record that Dr. Bennett ever personally examined Wilcox or had an ongoing treatment and psychiatrist-patient relationship with her. Wilcox argues that where both a physician's assistant or nurse practitioner and a physician sign a report, the "opinions are those of a treating physician as well as those of the physician's assistant." *Viverito v. Colvin*, 14-CV-7280, 2016 U.S. Dist. LEXIS 23260, at 43-44 (EDNY Feb. 25, 2016); *citing Riechl v. Barnhart*, 02-cv-6169, 2003 U.S. Dist. LEXIS 12610 (WDNY June 3, 2003). However, unlike the facts presented here, in both *Viverito* and *Riechl* there was evidence in the record that the plaintiff was examined by the physician's assistant as well as the doctor who co-signed the report or opinion. *See Viverito*, 2016 U.S. Dist. LEXIS 23260, at *19-21 (describing visits where plaintiff saw both a doctor and a physician's assistant at the same office); *Reichl*, 2003 U.S. Dist. LEXIS, at *10-11, 34 (the record indicated that plaintiff saw the doctor and the physician's assistant every three months over a period of eleven years and noting that

the plaintiff would often see the physician's assistant, "who would call in [the doctor] when needed"). However, even assuming that Dr. Bennett was Wilcox's treating psychiatrist, the Court finds that the ALJ provided good reasons for giving little weight to his findings.

The opinion of a treating physician or psychiatrist is to be given controlling weight if it is "well-supported by medically acceptable evidence and is not inconsistent with other substantial evidence in the record." 20 C.F.R. §404.1527(c)(2); *Snell v. Apfel*, 177 F.3d 128, 132-33 (2d Cir. 1999). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling…[a]nd the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell*, 177 F.3d at 133; *accord* 20 C.F.R. §404.1527(d)(4). In addition, the ultimate finding as to whether a claimant is disabled and cannot work is reserved to the Commissioner. *Id.* at §404.1527(d)(1). To that end, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability..[and a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell*, 177 F.3d at 133. Indeed, the Commissioner is required to explain the weight it gives to the opinions of a treating physician and to provide "good reasons" for not crediting the opinion of a treating physician. 20 C.F.R. §404.1527(c)(2).

Here, the ALJ explained how Dr. Bennett's opinion was not supported by medically acceptable evidence and was inconsistent with other substantial evidence in the record. (Tr. 427). Dr. Bennett indicated, on the Mental Impairment Questionnaire, that Wilcox had marked restrictions of daily living activities, marked difficulties in maintaining social functioning, marked deficiencies in concentration, persistence and pace, and one or two

14

episodes of decompensation. (*Id.* at 403). A marked limitation indicates that an individual's ability to function in that area independently, appropriately, effectively and on a sustained basis is seriously limited. (*Id.*). In giving little weight to this opinion, the ALJ reasoned that the marked impairments were not supported by the global assessment of functioning ("GAF") scores assigned to Wilcox by Merlin in June of 2012 and October of 2012. (Tr. 427). GAF scores, which range from 1 to 100, reflect a clinician's evaluation of a patient's level of psychological, social and occupational functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-TR) 32, 34 (4th ed., rev. 2000). On June 11, 2012, Merlin assigned Wilcox a GAF score of 75 with a highest GAF score within the year of 85. (Tr. 319). A GAF score of 71 to 80 indicates that if symptoms are present, they are transient with no more than slight impairments in social or occupational functioning. *Id.* at 34. A GAF score in the range of 81 to 90 indicates absent to minimal symptoms and good functioning in all areas. *Id.* On June 25, 2012, July 9, 2012, and October 2, 2012, Merlin assigned Wilcox GAF scores of 65. (Tr. 321, 322, 381). A GAF score in the range of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational or school functioning. *See* DSM-TR at 34. Overall, the individual is considered to be generally functioning well. *Id.* Thus, the GAF scores assigned to Wilcox over the course of her treatment with Merlin do not support Dr. Bennett's and Merlin's opinion that she was seriously limited in both her day-to-day activities as well as her social and occupational functioning on a sustained basis.

Wilcox argues that GAF scores are not sufficient to discredit a treating psychiatrist's opinion, and points to case law indicating that GAF scores are not dispositive of impairment severity. *See e.g. Chapman v. Colvin*, 15-CV-6523, 2017 U.S.

Dist. LEXIS 12085, at *17-18 (WDNY Jan. 27, 2017) ("[T]he literature regarding the GAF scale indicates a general lack of reliability."); *Beck v. Colvin*, 13-CV-6014, 2014 U.S. Dist. LEXIS 63751 (WDNY May 8, 2014) (internal quotation marks omitted) ("To the extent the ALJ rejected [a treating physician's opinion] as incompatible with [a] GAF score," the ALJ "failed to explain why a single GAF score, which is a generalized assessment, superseded [the treating physician's] more precise opinion."). However, the Court does not find these opinions to be analogous to the matter at hand. Here, the ALJ was not relying on a single GAF score but rather on a series of GAF scores assigned over the course of Wilcox's treatment. *See Zokaitis v. Astrue*, 465 Fed. Appx. 17 (2d Cir. 2012) (finding no errors in the Commissioner's decision to give little weight to statements by a social worker that plaintiff had extreme difficulties in social functioning and marked difficulties in maintaining concentration, persistence and pace where the social worker consistently assigned plaintiff a GAF score of 55, which would indicate only moderate difficulties in those functions). In addition, the ALJ was not relying on the GAF scores as proof of Wilcox's ability to work or dispositive of whether she qualified for benefits. Instead, the ALJ referenced the GAF scores as evidence that Dr. Bennett's ultimate opinion as to Wilcox's limitations was inconsistent with and unsupported by the medical evidence in Merlin's own treatment notes. To that end, the ALJ referenced not only the GAF scores but also Merlin's observation, in October of 2012, of "improvement in [Wilcox's] mood since the last visit with affect appropriate to mood, and less anxiety, depression and lability." (Tr. 380-381, 427). Likewise, the ALJ noted that Merlin found Wilcox's speech was not over productive or pressured and that her memory was intact,

her attention and concentration were fair, and her judgment and insight were adequate. (*Id.*).

In addition, the ALJ cited other substantial evidence in the record that was inconsistent with the marked limitations assigned by Dr. Bennett. The ALJ explained that the severity of the limitations were not supported by the findings of Dr. Santarpia, who conducted a thorough evaluation of Wilcox and whose opinion was consistent with the examination findings. (Tr. 365-69, 427). The ALJ gave some weight to the opinion of Dr. H. Tzetzo, a State Agency psychiatrist, who performed a Mental Residual Functional Capacity Assessment on Wilcox in October of 2012. (*Id.*). Dr. Tzetzo opined, in October of 2012, that Wilcox was able to understand and follow work directions in a work setting, maintain attention for such tasks, relate adequately to a work supervisor, and use judgment to make work-related decisions in a work setting. (Tr. 382-95, 427). Indeed, these findings are inconsistent with Dr. Bennett's opinion that Wilcox had marked difficulties in concentration, persistence and pace. The ALJ cited Wilcox's statements and testimony indicating that she is able to care for her own personal needs and grooming, cook, do light cleaning, do laundry, shower and manage her own money. (Tr. 147-54, 367, 421). Wilcox also indicated that is able to drive, shop, socialize, watch television and read. (*Id.*). She stated that she is able to go outside every day and that she does not have a problem getting along with others. (*Id.*). The ALJ noted that Wilcox works part-time as an activities aide at a nursing home. (Tr. 420, 429, 448-49). Her duties include escorting residents outside and for activities and dining, leading them in activities and arranging games, arts and crafts. (*Id.*). Thus, Wilcox's own statements as to her capabilities as well as her employment record belie Dr. Bennett's findings that she

17

had marked difficulties in carrying out daily living activities and social functioning. *See Micheli v. Astrue*, 501 F. App'x 26, 28-29 (2d Cir. 2012) (holding that it was not error for the ALJ to decline to afford controlling weight to a treating physician when the opinion was internally inconsistent as well as inconsistent with other substantial evidence in the record); *Manning v. Colvin*, 13-CV-497, 2014 U.S. Dist. LEXIS 147546 (WDNY Oct. 16, 2014) (finding that the ALJ properly gave little weight to the treating physician's opinion and "great weight" to the consultative examiner's prognosis where the latter was more consistent with the evidence in the record).

In addition to evaluating the medical evidence in support of Dr. Bennett's findings as well as its consistency with the other substantial evidence in the record, the ALJ also considered the nature, extent and frequency of the treating relationship. *See* 20 C.F.R. §416.927(c). He correctly noted that there is no evidence of longitudal treatment by Dr. Bennett. (Tr. 427). While Wilcox contends that Merlin's opinions are the same as Dr. Bennett's for purposes of the treating physician rule, Wilcox only treated with Merlin on four occasions. For all of these reasons, the Court finds that the ALJ sufficiently considered the opinion of Dr. Bennett and provided good reasons for assigning it little weight.

Finally, Wilcox contends that the Commissioner erred by failing to fully develop the record by obtaining treatment notes from Ms. Nuessle. (Dkt. No. 11-1).

Where deficiencies exist in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). This duty includes "assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or

other medical source is inadequate to determine whether the claimant is disabled." *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (EDNY 2004) (internal citations omitted). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (internal citations omitted).

Here, the administrative record is over 650 pages long and includes reports, treatment notes and test results from numerous medical providers and consultative examiners. The ALJ had a comprehensive record as to Wilcox's mental health condition and treatment. The record included records and treatment notes from her primary care doctor and rheumatologist, both of which referenced her mental health condition. It also included medical source evidence from agency consultants, including psychiatric evaluations and examinations, and testimonial evidence. Moreover, the ALJ had treatment notes from Wilcox's sessions at Suburban Psychiatric Associates with Merlin during the same time frame she was counseled by Nuessle. He had a detailed form completed by Nuessle for the New York State Office or Temporary and Disability Assistance which explained the nature and frequency of the counseling she provided, details of Wilcox's symptoms and Nuessle's observations and diagnosis. This information, combined with the other extensive evidence in the record, was sufficient for the ALJ to both evaluate Nussele's opinion and assess Wilcox's RFC. For these reasons, the Court finds that ALJ possessed a complete medical history as to Wilcox's physical and mental health condition, and there were no obvious gaps in the record.

For these reasons, the ALJ was not obligated to secure Nuessle's treatment notes before denying the benefits claim.[7]

**CONCLUSION**

For the foregoing reasons, plaintiff Michelle M. Wilcox's motion for judgment on the pleadings (Dkt. No. 11) is denied and defendant Commissioner of Social Security's motion for judgment on the pleadings (Dkt. No. 12) is granted.

The Clerk of Court shall take all steps necessary to close this case.

**SO ORDERED.**

Dated:    August 27, 2018
          Buffalo, New York

*/s/ Michael J. Roemer*
MICHAEL J. ROEMER
United States Magistrate Judge

---

[7] The Court also notes that the State Agency attempted to obtain treatment notes from Ms. Nussle. (Tr. 174). Nuessle responded with only her form report. (Tr. 174, 324-30). Plaintiff's attorney did not object to the completeness of the marked exhibits in the record during the April 2013 hearing and during the June 2015 hearing and also indicated that the record was complete. (Tr. 32, 446, 467). In addition, plaintiff was asked to provide any additional medical evidence not already in the record that would support her claim. (Tr. 566-67). In light of this information, the Court concludes that not only was the record complete, but that the ALJ made every reasonable effort to complete the record as required by Section 423(d)(5)(B) of Title 42 of the United States Code. *See Desane v. Colvin*, 3:15-CV-50, 2015 U.S. Dist. LEXIS 159919 (NDNY Nov. 30, 2015) (concluding that where plaintiff's attorney initially indicated that the record was complete at the beginning of the hearing and the ALJ agreed to hold the record open for two weeks to allow plaintiff's counsel to submit additional information, the ALJ made every reasonable effort to complete the record).